**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

DANA MULLIGAN,

|                          |                          |
|--------------------------|--------------------------|
| Plaintiff,               | **COMPLAINT AND**        |
|                          | **JURY DEMAND**          |

vs.

TOWN OF HEMPSTEAD AND GERALD C.                **DOCKET #** 21-CV-964
MARINO, in his individual capacity,

Defendants.

------------------------------------------------------------x

## NATURE OF THE ACTION

Plaintiff Dana Mulligan was the victim of escalating sexual harassment and sexual assault by Town of Hempstead Commissioner of General Services Gerald C. Marino. Fearing for her livelihood, career and social relationships, she did not report his conduct for years. At the same time, she assumed important and rewarding duties and thrived in her role as Assistant to Commissioner. Marino dangled the possibility of a promotion for Plaintiff for over a year but never secured her the position in order to exert additional pressure to succumb to his sexual advances. When Plaintiff found the courage to report Defendant Marino's conduct to the Town, they dodged for six weeks before engaging in a sham investigation and character assassination of Plaintiff. Many of her co-workers turned against her and began a campaign of retaliatory harassment. After concluding that they did not believe Plaintiff, the Town welcomed back Marino. As retaliation, they shipped Plaintiff out of Town Hall to a new position with no growth potential and severed from all her ties at the Town. Plaintiff brings this action for sex discrimination and retaliation under Title VII and the New York State Human Rights Law.

**THE PARTIES**

1.      **DANA MULLIGAN** is a woman residing in Long Island, New York and is an employee of the Town of Hempstead.

2.      The **TOWN OF HEMPSTEAD** ("Town") is a town on Long Island which comprises 22 incorporated villages and employs roughly 2000 people. Town Hall is located at 1 Washington Street, Hempstead, NY, 11550. Within the Town, there are 14 Commissioners who run various departments.

3.      **GERALD C. MARINO** ("Marino") has been the Commissioner of the Department of General Services of the Town of Hempstead since 2016. He is also the Executive Leader of the North Merrick Republican Club.

4.      The Town of Hempstead was, at all times relevant herein, Mulligan's "employer" within the meaning of all relevant Federal and New York state laws.

**JURISDICTION**

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as a civil action arising under the laws of the United States and supplemental jurisdiction over the New York State law claims under 28 U.S.C. § 1367.

6.      Plaintiff has exhausted her administrative remedies by dual-filing a charge of discrimination and retaliation with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC").

7.      On November 30, 2020 she received a Notice of Right to Sue from the EEOC and this action has been timely filed within 90 days of that Notice.

**VENUE**

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in the Eastern District of New York.

**FACTUAL BACKGROUND**

**Marino is Promoted to DGS Commissioner**

9.      Dana Mulligan and Gerry Marino were friends for many years through their children's sports and because they were active in their local Republican Party clubs. They began to work together at the Town of Hempstead's Water Department in 2009, when Mulligan was hired as a part-time clerical aide and Marino was a colleague who was handling inventory.

10.      By the end of 2015, Marino had considerably grown the North Merrick Republican Club, was its Executive Leader and was poised to secure additional authority within the Town of Hempstead government. At the time, Mulligan was still in the same non-competitive position at the Water Department. Mulligan was separated from her husband, living in alone in a basement apartment.

11.      With Mulligan as a vulnerable target, Marino began to groom her for later sexual harassment by seeking to develop a trusting relationship with her and by showcasing his authority and status in the community. As his appointment to Commissioner role was in the pipeline, he conspicuously used his "connections" to help her upgrade her insurance, get a lawyer, purchase a car, rent an apartment and find second jobs.

12.      Marino promised that he could carve a path for her to achieve job security in a Town job if she followed his instructions. In January 2016, Marino told Mulligan that he had leveraged his influence with the Nassau County GOP Chairman to engineer a transfer for her

from the Water Department to the Sanitation Department. He promised Mulligan the job in the Sanitation Department would be a way station for a civil service position under him.

13.     Partisan clubs in Nassau County are feeders for local government positions. Volunteering, contributions and fundraising efforts for a local club and its Executive Leader will result in employment, promotions, transfers and raises within Town government. These decisions are overseen and approved by County Headquarters.

14.     Though now in a different Department than Mulligan, Marino still flaunted his power. When Mulligan needed a computer and phone at the new job, Marino told her that if her supervisor refused, he would "make a call" and that "Obviously the answer is yes."

15.     At the time of the transfer, Mulligan was newly dating a co-worker in the Water Department. The transfer out of the Water Department was also a way to separate Mulligan from her new boyfriend. As soon as she moved to Sanitation, Marino started asking Mulligan to have lunch alone several times a month. He also invited her to dinners and political and formal evening events which he would often pay for or give her for free.

16.     On February 9, 2016, Marino was appointed by Kate Murray to the position of Commissioner of the General Services Department (hereinafter, "DGS"). He bragged to Mulligan about his wielding new authority as the Commissioner.

17.     As Commissioner of DGS, Marino had the authority to set department-wide policies, including but not limited to policies related to personnel, and was therefore an official with policymaking authority.

## Marino Transfers Mulligan to DGS to Report Directly to Him

18.     In the fall of 2016, Marino transferred Mulligan into his office at DGS, where he would have daily access to her and a direct reporting relationship. Mulligan began her role as an administrator in DGS on November 16, 2016.

19.     As soon as she moved to DGS, Marino told her she needed to switch from her local political club to the club where he is Executive Leader, the North Merrick Republican Club. Many of the co-workers in the Department were also North Merrick club members. She contributed endless hours to the club, handing out literature at 5 AM at the train station, canvassing neighborhoods, attending costly events all over Long Island and demonstrating her overlapping commitment to Marino as her boss at work and as the "Boss" of the club.

20.     During this early period, Marino continued to build Mulligan's trust. Marino created the title of "Assistant to Commissioner" for Mulligan. She was given a huge, beautiful office, wide discretion to make decisions and expenditures on behalf of the Department and was involved in key projects at the Animal Shelter and the Cemetery operated by the Town. She had administrative assistants and her own computer. She travelled with Marino to meetings and attended evening events with him. She filled in for Marino at meetings and was widely treated as his proxy. Mulligan felt respected, important and fulfilled, to finally put good use to her Bachelor's Degree in Business Administration. However, starting in or about 2017, the relationship between Marino and Mulligan began to change.

## Marino Takes Advantage of Mulligan

21.     Marino had cornered Mulligan into a position where she was indebted to him for his help, and dependent upon him for any advancement within the Town. Marino began to take advantage of Mulligan.

22.     He started testing her limits by hovering over her at her desk and violating her personal space. Then he began to call her over to his desk and then put his hand on her thigh and leg. Once when they were out to dinner with others for a Town event, he put his hand on her leg under the table.

23.     Mulligan rejected Marino's advances, but he ignored her and became even more persistent. He would find new reasons to travel by car alone with her and would demand to hold her hand. He tried to rub her back as if he was giving her a massage. He would point to his cheek and ask for kisses.

24.     Mulligan continued to work hard and assume responsibility within DGS, including considerable involvement in a project to beautify Greenlawn Cemetery and honor its veterans' graves, overseeing hiring and policies at the Animal Shelter, and managing scarce parking permits. She often sat in with Marino at the Town Board public meetings.

25.     At the same time that Mulligan was rewarded by the meaningful and important tole she was playing in Town government, Marino's harassment was escalating. On many occasions, when he walked down the hall behind her, he grabbed her buttocks. On several occasions, he called her into his office kitchen and then pulled her close, kissed her on the mouth and put his tongue down her throat. He repeatedly asked her to go out to dinner with him, even on his birthday. Mulligan rejected Marino's advances, but she had no choice but to attend work and club events.

26.     Things got worse. Several times while she was in her office in 2018 and 2019, Marino stood over her at her desk as if to look at what she was working on and then suddenly reached down and grabbed her breast underneath her shirt, touching her nipple. It happened so

fast but she managed to say, "get away," and then moved her chair and closed her shirt. Marino just laughed at her reaction.

27.     On other occasions, in or about calendar years 2018 and 2019, Marino squeezed her nipples on top of her shirt or he rubbed her back and felt her bra. Twice he came into her office, shut the door and closed the blinds and trapped her. Mulligan was intimidated, not knowing what Marino might try to do behind closed doors and that no one would likely believe her. Marino did not leave until she screamed for him to get out.

28.     Marino touched or molested her and/or made comments about her appearance on a continuous basis for roughly two years, though she rejected his advances. She said "stop" and "no," she avoided him, she changed her departure time, she walked behind him, she secured other transportation, she changed her parking spot, she sat further away from him at meetings, she wore pants more often and she yelled. In response to her rejection, he would often laugh or say, "It doesn't hurt" or "I really need this today."

**Mulligan is Trapped in a No-Win Situation**

29.     In spite of the rewarding contributions she was making in her job, most days were emotionally exhausting because of the harassment she was suffering. Many days her hands and legs often shook uncontrollably. Her stomach was upset and she would often throw up at work. She was often breathless and experienced countless sleepless nights. Her chest was sometimes tight and she heard ringing in her ears. She dug compulsively at the skin on her arms with her nails, and the cuts would bleed through her shirts. When her boyfriend would try to put his arm around her, she would flinch.

30.     The stakes of reporting Marino's sexual harassment were impossibly high. Mulligan feared that she would lose her job, promising career and/or the authority she had been

granted in the job; complaining about Marino, the Commissioner of DGS and the Executive Leader of the North Merrick Republican Club would alienate her from her co-workers and the members of the club.

31.     Mulligan was part of a tight-knit community, built around the overlapping social circles of workplace, neighborhood, and political club. As a Town employee for almost a decade, she developed personal relationships with co-workers, had frequent meals together, and socialized outside of work. They shared life milestones like funerals, births, department celebrations, retirements, family deaths and holiday parties. She and her co-workers, and served as a support network through major life milestones.

32.     These relationships were reinforced by the evenings and weekends that many of Mulligan's co-workers spent together in support of Marino's political club. Club members are expected to congregate to staff tables at election primaries, canvass and hand out flyers, get signatures on petitions and promote candidates during election season. They are obligated to purchase expensive tickets to foundation dinners, Inaugural Balls, fundraising events, and dinner dances.

**Marino Dangles the Hope of a Civil Service Position for Mulligan**

33.     On February 15, 2018, Mulligan passed the civil service qualifying test and was placed second on the Eligible List, for the position of Office Service Assistant, Grade 12. In her several attempts to secure a promotion, this was the first time she was actually "reachable" because her number was high on the Eligible List. She expected that Marino would recommend her promotion and adjust her title at DGS, as planned.

34.     Two weeks later, Marino showed Mulligan that he had written her a recommendation to the Director of Human Resources, William Sammon ("Sammon"), had

prepared a Personnel Action Request and had prepared a draft resolution for the Board for adoption for a change of her status from Clerk Laborer, Grade 9, to Office Services Assistant, Grade 12. If approved the following week, this title would be a significant promotion in terms of salary, responsibilities and future promotional opportunities.

35.     Marino told Mulligan that the resolution was placed on the Board's calendar for March 7, 2016. Mulligan felt tremendous pressure because it seemed that Marino was dangling the promotion in order to create an incentive to succumb to his sexual overtures.

36.     Mulligan did not comply and on the morning that the resolution was to be heard, the resolution was inexplicably removed from the agenda. Marino did not explain why.

37.     Employees from other departments who performed similar work were being appointed to positions as Office Services Assistant, Grade 12 and received their promotions. Sammon later told Mulligan that he never received the recommendation that Marino had showed her. Mulligan was crushed and her mental health deteriorated further.

38.     Marino deliberately kept Mulligan in thrall to him for over a year, holding in abeyance the promotion until she complied with his sexual entreaties.

**With Mulligan's Promotion Off the Table, Marino Becomes More Brazen**

39.     Without a promotion, the harassment continued. Also in 2018, Mulligan was walking up the stairs to her office with Marino. He began to repeatedly slap her buttocks. She kept saying, "stop" and "don't touch me!" but he persisted as she tried to open the door to the Department Hall and was fumbling with the lock. He finally responded, laughing provocatively and tauntingly, by saying: "What are you gonna do about it?"

40.     As this was happening, Mulligan saw a Town employee pass by at the bottom of the stairwell in response to the noise. After Marino left, Mulligan cried about Marino's sexual

harassment to Kathy O'Donnell, a part-time clerk laborer in DGS and a member of Marino's club.

41.     On another occasion, during a brief elevator ride, Marino touched her breast. She was sure that someone witnessed his actions as the elevator door opened. She was so shaken when the doors opened that she was afraid to go back to her office, which was close to Marino's. Instead she went into the nearest office where she would not be alone, which belonged to Mike Seifert (hereinafter, "Seifert"), the Town Building Maintenance Supervisor. There, she broke down and conveyed what happened. After that incident, Seifert tried to look out for her.

42.     In early 2018, Mulligan tried to move her office away from Marino's to keep him further away, but he would discourage or not allow her to. At one point, an office opened outside of the Department in a busy hallway but Marino declined multiples times to authorize her move. In mid 2018, one day when Marino was out, Seifert helped Mulligan to move to the vacant office. When he returned to see that she had moved, Marino said to Mulligan snarkily, "How's your office?"

**Mulligan Sees an Opportunity to Stop the Harassment**

43.     In April 2019, there was a sexual harassment training at the Town by the law firm, Jackson Lewis. At the end of the training, Marino spent extra time asking questions of the trainer about whether specific conduct would constitute sexual harassment. He initially resisted signing the training acknowledgement papers, saying that he would "be on Channel 2" if he signed them.

44.     After the sexual harassment training, Seifert learned that it was his legal duty to report sexual harassment. Mulligan thought maybe she could end the harassment against her and avoid the social repercussions by anonymously reporting the sexual harassment through Seifert.

45.     Even after the sexual harassment training, Marino's sexually charged comments and sexual advances continued. Believing that this might be the way she could keep her job, her workplace friendships and her devotion to Marino's political club, she told Seifert about the incident in the stairwell when Marino slapped her buttocks.

46.     She wrongly thought she could avoid the social, political and workplace consequences. She did not expect that her name would ever be revealed.

**Mulligan's Complaint of Sexual Harassment becomes a Political Football**

47.     It took more than six weeks to commence an investigation of Mulligan's claims, during which time she continued to work side by side and attend political events with Marino. During this time, Seifert reached out to multiple managers in the Town leadership who were unavailable, dropped the ball, or passed the buck.

48.     After notifying the office of the Democratic Town Supervisor, Laura Gillen, they told Seifert to contact the office of Erin King Sweeney, Republican Councilwoman to Town Board District 5. King Sweeney's executive assistant told him they didn't think they should be involved and that they should go to the Town Attorney. He contacted the Town Attorney's office and the Town's Human Resources office, who did not respond. No one complied with their duty to report, address and/or promptly investigate the sexual harassment claim.

49.     During the same time period, Mulligan was called in multiple times to meet with Mitch Pitnick and Debbie Algios, both Counsel to Town Supervisor Gillen. They encouraged her to come forward about Marino's harassment and promised there would be no retaliation. Even Supervisor Gillen came in during the meeting, praised her courage and offered her cell phone number. After her assurances, Mulligan finally broke down and told Attorney Pitnick about some of the sexual harassment she had been enduring for years working under Marino. Pitnick

promised her that he would report it anonymously and his Memo to the Town Attorney described her as "Female Employee."

50.     Between May 24 and June 11, 2019 Town officials were paralyzed by infighting about how to handle the investigation. At the end of May, Pitnick reported anonymously to Town Attorney Joseph Ra the sexual harassment and indicated that a neutral investigator was warranted, outside of the Town Attorney's Office, given the multiple conflicts of interest. However, Town Attorney Joseph Ra ignored this conflict of interest and roguely began to undertake an investigation of his own.

51.     On June 4, 2019, an Investigator from the Town Attorney's Office, Tony Costales approached Mulligan for questioning. When Mulligan said she did not want to say anything, he responded, "You work for the Town, so you have to cooperate." However, Pitnick directed the Town Attorney's Office to "cease and desist" their informal investigation and retain a neutral investigator within the week.

**Marino is Given a Hero's Farewell while the Town Strips Mulligan of her Duties**

52.     In the meantime, without any warning to Mulligan, Marino was suddenly out of the office, and her co-workers and Andrew Mastromarino, Deputy Commissioner of the General Services Department (hereinafter "Mastromarino") were giving her the cold shoulder. She reached out to Pitnick to find out what was going on. On information and belief, Marino and the Department had been notified about the sexual harassment complaint.

53.     Mastromarino held his first staff meeting and invited all except for Mulligan and Seifert, the two staff members who had brought the complaint.

54.     On May 30, 2019, without any warning to Mulligan, Marino came back to Town Hall and spoke with Joseph Ra, with whom he served together on the Nassau County GOP Board

(also called "Headquarters"). Ra walked Marino to the elevator and patted him on the back before he left the fourth floor of the building.

55.     Mastromarino chased after Marino to the parking garage, caught up and spoke to him for a few minutes and then also patted him on the back. Mastromarino returned directly to the DGS offices and the staff rushed to meet him at the elevator. He talked with the staff, except for Mulligan and Seifert, the two staff members who had brought the complaint.

56.     Less than an hour later, Mastromarino informed Mulligan that he would act as Mulligan's direct supervisor in Marino's absence and began to take away all of her former duties. Though she had previously been going there three days a week, Mulligan was prohibited from going to the Animal Shelter. She was instructed to cease all projects at the Cemetery. She had all of her authority stripped and was assigned the task of timekeeping for part-time staff.

57.     Mulligan was then called in to meet with Albina Kataeva ("Kataeva"), Deputy Town Attorney, and Director of Human Resources, William Sammon. Kataeva told Mulligan to let her know if she wanted to transfer out of the Department, and Mulligan responded that she wanted to stay in her job in DGS. Kateva said that they would be moving her to another department permanently anyway. Mulligan asked why she would have to leave DGS when she didn't do anything wrong. They responded, "Well, [Marino's] the Commissioner."

58.     When Mulligan asked about where Marino would be placed, they would not say. No one ever explained where Marino was, and when and if he would return. Some told Mulligan that he was getting his office painted and would be out for a few days; some said that he was working from Merrick. Mulligan constantly worried that she might at any time have to again face Marino.

**Mulligan is Treated like The Enemy**

59.     The next day many of the offices in DGS got locks put on them. Mulligan, once the Commissioner's Assistant, was now not invited to meetings, Town Board meetings, or interviews with candidates for positions. At the same time that all of her duties were stripped, DGS co-workers and club members were marginalizing and isolating her. Having crossed Marino by holding him accountable for the sexual harassment, Mulligan now became a pariah.

60.     The day Marino left, Mulligan had brought in cardboard boxes collected for the Animal Shelter, but was told by Mastromarino that she was not allowed to deliver them. He told her that another co-worker and club member, Bobby Guise, would deliver the boxes; the next day, on May 31, Mulligan learned that Bobby Guise not only refused to take the boxes to the Shelter, but had angrily crushed them all and had a good laugh with others about it.

61.     Also in June, Mulligan found key scratches on her and her boyfriend's car while parked in the garage at work. Another day in June she noticed that her office had been rummaged through and things moved around.

62.     Co-workers refused to respect her or her new limited roles. Though her only task was now timekeeping, some co-workers would refuse to submit their time records and her attendance sheet once went missing and had to be reconstructed.

63.     Some co-workers stopped talking to and texting her and stopped coordinating lunches together. A co-worker told her that other employees in her Department had been told it would be a good idea to unfriend Mulligan on social media. In fact, both Kathy O'Donnell and Maura Nixon, co-workers, did unfriend her in June. On June 6, 2019 one of those co-workers posted on Facebook that "snitching on your co-workers" won't get you ahead at work. On information and belief, she thought Mulligan was a "snitch" for reporting Marino.

64.    Later in the summer, co-workers at DGS had a birthday party and staff all signed her birthday card. Though she had worked alongside these co-workers for 5 years, Mulligan was now neither invited to the party nor asked to sign the card.

65.    Mulligan notified Mastromarino about the hurtful and retaliatory actions by her co-workers. They said they would look into it, but nothing changed. She notified Pitnick and Kataeva that Mastromarino failed to intervene effectively. Kataeva said that the behavior of people in DGS was another reason why Mulligan would have to move.

66.    Mulligan told her again that she didn't want to move, that she should be allowed to resume her duties and that her co-workers should be counseled. Any remedial action taken by the Town was insufficient to address the retaliatory harassment.

**The Town Commences a Sham Investigation to Protect Marino
and Attack Mulligan's Character**

67.    Near the middle of June, the Town hired Jackson Lewis, a law firm that is known for representing and defending employers. Kathryn J. Russo, Esq. (hereinafter, "Russo"), a Principal at the law firm, to investigate Mulligan's complaint. Jackson Lewis was the same firm that trained Town employees about how to avoid sexual harassment just two months earlier.

68.    Mulligan met with Russo once on June 19, 2019 in her office in Melville. Although Russo told her to call if she remembered anything else, when Mulligan reached out several times, she dismissively rushed her off the phone. Russo never followed up to inquire about conflicting or additional testimony she collected from other witnesses.

69.    On July 8, 2019, less than two months after she reported the sexual harassment, the Town opened a formal inquiry into Mulligan's overtime hours. Tony Costales, an Investigator from the Town Attorney's Office, summoned her for questioning. On information and belief, the inquiry was initiated by Marino, who was responsible for authorizing payment of

her hours. In her ten years working for the Town, Mulligan had never been investigated before and never met this investigator before. The Town Attorney's Investigator demanded multiple meetings with Mulligan for weeks while the sexual harassment investigation by Russo was underway and into August.

70.     Mulligan told Russo about the retaliation she was experiencing in DGS, including the retaliatory harassment, the Acting Commissioner's failure to act, and the investigation into her hours. Russo brushed it off, telling her to notify the Town.

**Marino Returns to the Town Hall Cafeteria to Proclaim that he was 'Vindicated'**

71.     During June and July, Mulligan continued to work in DGS while the Town tried to move her, and Marino was seen at the office multiple times. Mulligan never knew if and when she might run into him, since employees would tell her that they saw him or one of his cars parked in his Town parking spot. Many confided that they were told, if asked, to say that they hadn't seen Marino. Mulligan was constantly on edge that Marino might show up anytime. At the end of July, Marino was seen back in Town Hall, in the cafeteria jubilantly telling Town employees that the investigation had concluded that he was vindicated.

72.     About a week later, in the hallway first thing in the morning, a co-worker casually notified Mulligan about Russo's findings. She told Mulligan that was sorry to hear that Marino had been cleared of the sexual harassment Mulligan had reported. No one had told Mulligan anything, but everyone in DGS already knew. A group of co-workers were laughing and talking about the findings that morning in someone's office.

73.     On information and belief, Marino had already been notified by Ra of the outcome of the investigation. Mulligan reached out to Russo, who told her that she had indeed already sent in her investigative findings to Ra some time back.

74.     Mulligan called Pitnick, Kataeva, and her union representative John Flanagan (hereinafter "Flanagan") to confirm if this was true. She also made an appointment to see Supervisor Gillen at her first available opening on August 9, 2019 at 9:30 AM. This appointment was rescheduled twice and was cancelled by Gillen each subsequent time. No one from the Town would even speak to Mulligan about the findings, though Marino was already back at Town Hall celebrating.

### Jackson Lewis Provides Cover for Marino and the Town

75.     Finally, on August 5, 2019, Mulligan was called into a meeting with Sammon, Kataeva and Flanagan to inform her that the results of the investigation were inconclusive.

76.     In response to Russo's findings, the Town decided that Marino would be required to take another sexual harassment training and Mulligan would be moved out of DGS. She protested again that she had done nothing wrong. She again asked about when Marino would be officially back in the office, so she would be prepared, but they would not tell her.

77.     Throughout August 2019, no Town official ever warned her when Marino would be returning but many co-workers notified her that they saw him or one of his cars. She informed Flannagan, Kataeva and Pitnick more than once that he was on the premises.

### Mulligan is Shipped out of Town Hall to the Boondocks

78.     On September 13, 2019, Marino was back in his same job and office in DGS and Mulligan was moved out of Town Hall to make way for Marino.  While she was out on leave for hand surgery, and without any notice or her consent, she was notified by phone on September 15. Sammon left her a message to report to work the next day, several blocks away, to begin a new job at the Department of Occupational Resources (hereinafter "DOOR").

79.      Initially, her principal duty in this position was to sign in people who were attending job training classes. She had no projects, responsibilities or discretion. She lost the responsibilities and the title of "Assistant to Commissioner" in this new position. This transfer will interfere with any possibilities for a civil service promotion since her duties have been greatly reduced.

80.      She longer had an office, name plate, or even a desk, and worked at a shelf with drawers and no window. She did not have a designated computer.

81.      She is now completely severed from the life of the Town. She does not work in Town Hall and she no longer has access to her Town e-mail account. After a year in this position, she finally received an email address which does not include her first name and did not have a Town of Hempstead suffix in the address. Neither co-workers nor the Town itself can easily find her; even Human Resources did not know how to easily send her health insurance papers. Without the generous information sharing on Town email, Mulligan cannot easily know if a test is offered, a position opens up and cannot learn of events like retirements, deaths and births.

82.      Mulligan has always worked second and third jobs. In order to work at DOOR, her hours were changed effective immediately from 8 AM – 4 PM to 9 AM – 5 PM, so Mulligan lost her lucrative evening waitressing job. She complained to her union representative and to Sammon about being forced to change her hours.

83.      While Mulligan's career has come to a standstill, Kathy O'Donnell, who told the investigator that Mulligan never complained to her about sexual harassment, was promoted in 2020 to full-time position, in Grade 9, which is very uncommon in the Town.

84.     Mulligan had dedicated hours and time in furtherance of her career at the Town of Hempstead and only wanted to be able to work without being sexually harassed. She devoted ten years to the Town and loved government service and her co-workers. After complaining about sexual harassment, she was removed from her office and Department, and cut off from the lifeblood of the Town's work. Marino, in spite of years of harassing Mulligan physically and psychologically, resumed his stature, influence and career as Commissioner.

<u>FIRST CAUSE OF ACTION</u>

**Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964,**
**42  U.S.C. § 2000e-a (1) and (2)**
*As against Defendant Town of Hempstead*

85.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

86.     Mulligan was subjected to sexual harassment in the form of a hostile work environment, *quid pro quo* harassment and discriminated against in the terms and conditions of her employment because of her sex.

87.     As a direct and proximate result of Defendants' discrimination, she has suffered and continues to suffer severe mental anguish and emotional distress.

<u>SECOND CAUSE OF ACTION</u>

**Retaliation and Retaliatory Harassment in Violation of Title VII of the Civil**
**Rights Act of 1964, 42 U.S.C § 2000e-a (3)(a)**
*As against Defendant Town of Hempstead*

88.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

89.     Mulligan was retaliated against and subjected to retaliatory harassment for engaging in protected activity under Title VII of the Civil Rights Act of 1964.

90.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Mulligan has suffered and continues to suffer severe mental anguish and emotional distress.

<u>THIRD CAUSE OF ACTION</u>

**Sexual Harassment and Retaliation in Violation of 42 U.S.C. §1983 and the Equal Protection Clause**
*As against all Defendants*

91.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

92.     By the acts and practices described above, Marino, in his individual capacity and under color of state law, sexually harassed and discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex, including by both creating a hostile work environment based on sex and engaging in *quid pro quo* harassment, thus depriving plaintiff of her rights under the Equal Protection Clause, in violation of 42 U.S.C. §1983.

93.     At all relevant times, Marino was a policymaker for the Town of Hempstead, and his sexual harassment and discrimination against Plaintiff in the terms and conditions of her employment and on the basis of her sex, thereby constituted a policy or custom attributed to the Town of Hempstead.

94.     At all relevant times when serving as a policymaker for the Town of Hempstead, Marino believed he could sexually harass Plaintiff, as a female on his staff, with impunity, thus depriving Plaintiff of her rights under the Equal Protection Clause, in violation of Section 1983.

95.     As a result of Defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish emotional distress and humiliation unless and until this Court grants relief.

96.     Marino engaged in these practices with malice and with reckless indifference to Plaintiff's federally protected rights.

FOURTH CAUSE OF ACTION

**Sex Discrimination in Violation of the New York State Human Rights Law**
*As against Defendant Town of Hempstead*

97.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

98.     Article 15 § 296 (1)(a) of the New York Human Rights Law, N.Y. Exec. Law, prohibits discrimination and harassment in employment.

99.     Mulligan was subjected to sexual harassment in the form of a hostile work environment, *quid pro quo* harassment and discriminated against in the terms and conditions of her employment because of her sex.

100.    As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

101.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

**FIFTH CAUSE OF ACTION**

**Retaliation and Retaliatory Harassment in Violation of the
New York State Human Rights Law**
*As against Defendant Town of Hempstead*

102.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

103.    Article 15 § 296(7) of the New York Human Rights Law, N.Y. Exec. Law, prohibits retaliation for engaging in protected activity.

104. Plaintiff was retaliated against for opposing the sexual harassment against her.

105. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

106. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law.

## SIXTH CAUSE OF ACTION

**Aiding and Abetting in Violation the New York State Human Rights Law**
*As against Defendant Gerald C. Marino*

107. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

108. Article 15 § 296 (6) of the New York Human Rights Law, N.Y. Exec. Law, prohibits aiding and abetting discrimination and harassment in employment.

109. Mulligan was subjected to sexual harassment in the form of a hostile work environment, quid pro quo harassment and discriminated against in the terms and conditions of her employment because of her sex.

110. As a direct and proximate result of Defendant's discrimination and harassment, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

111. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants as follows:

A. Judgment in favor of Plaintiff against Defendants, concluding that Defendants have violated the law by discriminating against and retaliating against Plaintiff;

B. Lost wages, benefits and compensatory damages attributed to Plaintiff's severe mental anguish and emotional distress;

C. Punitive damages as against Defendant Marino in an amount to be determined at trial;

D. All costs and disbursements of this action, including reasonable attorneys' fees; and

E. Any other further relief the Court may deem just and proper.

Dated: February 22, 2021

_____
Rita A. Sethi, Esq.
7 Shorewood Drive
Sands Point, N.Y. 11050
rita.sethi@gmail.com
(516) 776-8209

Laura Wong-Pan (LW8530)
Law Office of Laura Wong-Pan PLLC
319 Mill Street
Poughkeepsie, New York 12601
lwp@laurawongpanlaw.com
Tel. (845) 218-1288
Fax (845) 684-0007

*Attorneys for Plaintiff*