UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DANA MULLIGAN,

               *Plaintiff*,

   -against-

TOWN OF HEMPSTEAD and GERALD C. MARINO,

          *Defendants*.

21-CV-964 (ARR) (ST)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

Dana Mulligan brings this action alleging employment discrimination by the Town of Hempstead and Gerald Marino. Her First Amended Complaint ("FAC") alleges that Mr. Marino, the Commissioner of the Town's Department of General Services, fostered a culture in which sexual harassment was tolerated and engaged in harassment of his own toward Ms. Mulligan; as relevant to the instant motions, she asserts that Mr. Marino denied her a promotion when she rejected his sexual advances, and that the Town transferred her to a less desirable position after she reported his harassment. Plaintiff asserts that these actions constituted sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-a *et seq.*; 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment; and the New York State Human Rights Law, N.Y. Exec. L. § 296. Defendants have moved for summary judgment and plaintiff has opposed and filed a cross-motion on the issue of whether Mr. Marino was a policymaker for the purposes of municipal liability. For the reasons stated below, I grant defendants' motion in part and deny it in part; I also deny plaintiff's cross-motion.[1]

---

[1] An unredacted version of this Opinion & Order has been filed under seal.

## BACKGROUND

In 2016, Mr. Marino was appointed Commissioner of the Department of General Services ("DGS"), and Ms. Mulligan, who had worked for the Town since 2009, was transferred to the department to be his assistant. Defs.' Local Rule 56.1 Statement of Undisputed Facts ¶¶ 18, 22, 32–34 ("Defs.' Statement"), ECF No. 47; Pl.'s Response to Defs.' Local Rule 56.1 Statement ¶¶ 18, 22, 32–34 ("Pl.'s Response"), ECF No. 53. In this capacity, she was responsible for scheduling meetings, taking attendance, providing employees with parking spots, and reporting to Mr. Marino on the status of certain projects, Defs.' Statement ¶ 34; Ms. Mulligan also assisted Mr. Marino with various capital projects, ensuring that they were operating according to schedule and following up when he was not available, Sethi Decl., Ex. 1 at 222:3-14, 223:2-9 ("Marino Tr."), ECF No. 54-1. Other employees viewed Ms. Mulligan as Mr. Marino's "right-hand man" and as someone who played an "important role" in DGS. *Id*., Ex. 6 at ¶ 29 ("Flanagan Decl."), ECF No. 54-6; *Id*., Ex. 4 at 74:13-18 ("Seifert Tr."), ECF No. 54-4.

Plaintiff asserts that the environment at DGS was inappropriately sexually charged under Mr. Marino's leadership. Employees describe overhearing "filthy and vulgar" conversations about people's sex lives that was "disturbing" to witness in a workplace. Flanagan Decl. ¶¶ 11–12; Sethi Decl., Ex. 4 at107:11-24 ("Seifert Tr."), ECF No. 54-4. One employee, Michael Seifert, describes overhearing a colleague ask his secretary what color underwear she was wearing. *Id.* at 112:8-21. Another employee, John Flanagan, Jr., recounts witnessing a video chat between several workers in the office and a colleague who was on maternity leave: They asked her to expose herself to them; she suggested that she was touching herself; and one of the employees in the office said that he might sleep with her after a couple of drinks. Flanagan Decl. ¶ 15.

Plaintiff characterizes Mr. Marino as at best indifferent to employees' complaints of

harassment, and at worst retaliatory toward those who spoke up. Mr. Seifert testified that when he reported the underwear incident to Mr. Marino, the Commissioner told him, "we all can get along, we all have to work together." Seifert Tr. 113:7-13, ECF No. 54-4. When an employee named Alexandria Natoli reported what she perceived as harassing conduct to Mr. Marino, he reportedly told her that "this isn't a playground, and I'm not your big brother. You have to handle the situation yourself." Sethi Decl., Ex. 25 at 175, ECF No. 54-25; *see* Flanagan Decl. ¶ 12; *see also* Seifert Tr. 130:14-24, ECF No. 54-4. Both Ms. Natoli and Mr. Seifert were at some point transferred to different positions or locations, although—as discussed in more detail below, *see infra* Section II—it is unclear whether those transfers were in any way related to the employees' complaints. *See* Napolitano Decl., Ex. H at 329, 385, 397 ("Russo Report"), ECF No. 50-1 (filed under seal); Seifert Tr. 31:9-17, 134:12-19, ECF No. 54-4; Flanagan Decl. ¶ 20. In an internal complaint directed to the Town Attorney, a custodian named Dorothy LaPierre alleged that after she reported harassment to Mr. Marino, she was transferred to work in an unpleasant location surrounded by only male coworkers. Sethi Decl., Ex. 20 at 735, ECF No. 54-20.

Plaintiff further alleges that Mr. Marino not only tolerated other employees' harassing conduct, but also engaged in harassment of his own by commenting on her appearance, touching her legs and buttocks, reaching down her shirt, and asking her to kiss him on the cheek. Sethi Decl., Ex. 2, 155:23-25, 156:12-21, 159:2-3, 179:13-23 ("Mulligan Tr."), ECF No. 54-2.

In late 2017 or early 2018, Ms. Mulligan sat for a civil service exam and received the second-highest score among DGS employees. Pl.'s Response ¶¶ 37, 39. Her score made her eligible for a promotion to the position of Office Services Assistant, which would result in a raise. *Id.* ¶¶ 35–40, 45. After Ms. Mulligan received her score, Mr. Marino wrote a memo to William F. Sammon, the director of the Town's Department of Human Resources, recommending that she

receive this promotion. Napolitano Decl., Ex. L, ECF No. 45-16. A Personnel Action Request form ("PAR") was circulated to Mr. Sammon, Christopher Cianciulli (the chief of staff to the Town Board), and James LaCarruba (the chief of staff to the then-Town Supervisor) in advance of a March 20, 2018 Board meeting. Pl.'s Response ¶¶ 14, 41–42; Napolitano Decl., Ex. N, ECF No. 45-18; Cianciulli Aff. ¶ 3, ECF No. 45-2. What happened next is subject to significant dispute by the parties.

Defendants contend that although Mr. Marino could recommend Ms. Mulligan for promotion, only the Board had the authority to effectuate promotions from the list of eligible employees. *See* Napolitano Decl., Ex. D at 59:8-16, 270:22–271:2 ("Marino Tr."), ECF No. 45-8. In their telling, Mr. Sammon, Mr. Cianciulli, and Mr. LaCarruba met in advance of the mid-March 2018 Board meeting to discuss the proposed personnel changes up for consideration. Cianciulli Aff. ¶ 8; Napolitano Decl., Ex. E at 77:10–81:22 ("Sammon Tr."), ECF No. 45-9. In reviewing Ms. Mulligan's proposed promotion, they say, one of the meeting attendees pointed out that she had received several recent pay raises; the three accordingly decided not to act on her proposed promotion. Cianciulli Aff. ¶ 11; Sammon Tr. 80:12–82:25, ECF No. 45-9. Mr. Marino played no role in this decision, according to defendants, and indeed continued to advocate for Ms. Mulligan's promotion after Mr. Sammon, Mr. Cianciulli, and Mr. LaCarruba decided to table it. Cianciulli Aff. ¶¶ 12–13; Marino Tr. 302:13–303:8, ECF No. 45-8.

Plaintiff tells quite a different story. She disputes the significance of the Board's involvement in her promotion decision, noting that the Board "routinely ratifies" department heads' recommendations and pointing to several instances where department commissioners recommended employees for promotions and the Board approved those recommendations. Pl.'s Response ¶ 43; Sethi Decl., Ex. 22, ECF No. 54-22. Plaintiff believes that Mr. Marino played some

4

role in tabling her promotion. At some point in March 2018, she says, Mr. Marino invited her to go to dinner with him for his birthday and she rejected his invitation. Sethi Decl., Ex. 7 at ¶¶ 11–12 ("Mulligan Aff."), ECF No. 54-7. It is unclear from the record exactly when the invitation and rejection happened; plaintiff states only that Mr. Marino's birthday was on March 25. *See id.* Plaintiff suggests that after she rejected Mr. Marino's dinner invitation, he took some unspecified action to deny her the promotion for which he had previously recommended her. *See* Pl.'s Opp'n Mot. Summ. J. & Cross-Mot. 5–6, 11 ("Pl.'s Opp'n"), ECF No. 56.

The following spring, Ms. Mulligan told Mr. Seifert that Mr. Marino had been harassing her. Napolitano Decl., Ex. G at 139:18-22 ("Seifert Tr."), ECF No. 45-11; Ex. 25 at 5. Mr. Seifert in turn reported the alleged harassment to Mitch Pitnick, counsel to the then-Town Supervisor. Pl.'s Response ¶¶ 15, 63. Mr. Pitnick interviewed Ms. Mulligan and wrote a memorandum to the Town Attorney requesting an outside investigation into her allegations, as well as those brought by Ms. Natoli. *Id.* ¶¶ 66, 68–69; *see* Russo Report at 325. About a month after receiving Ms. Mulligan's report, the Town retained a law firm to conduct an investigation, and the investigator interviewed approximately twenty-five employees, including Ms. Mulligan and Mr. Marino. Pl.'s Response ¶¶ 73, 75; Russo Report at 336.

On July 26, 2019, investigator Kathryn Russo delivered a report concluding that Ms. Mulligan was not credible and that any contact between Mr. Marino and Ms. Mulligan was not sexual in nature. *Id.* ¶ 78; *see* Russo Report at 331. The report recommended that Mr. Marino and Ms. Mulligan be physically separated and that Ms. Mulligan be transferred to a different position. Pl.'s Response ¶ 81; Russo Report at 337–38. Ms. Mulligan discussed the report's findings with Mr. Sammon, Mr. Flanagan (her union representative), and Deputy Town Attorney Albina Kataeva. Pl.'s Response ¶ 97; Napolitano Decl., Ex. F at 9:2-4 ("Kataeva Tr."), ECF No. 45-10.

The parties dispute what happened next.

Defendants assert that plaintiff expressed willingness to transfer to a different department, citing Ms. Kataeva's testimony that Ms. Mulligan "wasn't opposed to it," "was open to it," and said that "she thought that maybe that was the best move for her." Kataeva Tr. 80:7-19, ECF No. 45-10. Defendants also stress that Ms. Mulligan willingly interviewed with another department, *see* Sammon Tr. 115:21–116:7, ECF No. 45-9; Napolitano Decl., Ex. HH, ECF No. 45-38, and that she emailed her DGS colleagues informing them that she would be transferring, Napolitano Decl., Ex. EE, ECF No. 45-35. They emphasize that the Town made efforts to transfer Ms. Mulligan to a position where she could remain eligible for a promotion based on her civil service exam score. *See* Kataeva Tr. 82:18–83:20, ECF No. 45-10 ("[W]e wanted to place her in a position . . . where she could still be . . . reachable."); Napolitano Decl., Ex. BB, ECF No. 45-32 (email from Ms. Kataeva to Ms. Mulligan explaining that she had passed along her concerns of "remaining reachable on the Civil Service list"). Laura Ra, a personnel specialist with the Town, asserts that she met with Ms. Mulligan in early August 2019 and advised her that if she transferred to a new department, she would need to provide a written request to transfer her civil service score from DGS's "eligible list" to that kept by the new department. Ra Aff. ¶¶ 11–13, ECF No. 45-3.

Plaintiff tells a different story. She testified that she "didn't want to go" to a different department and was "really mad about it." Mulligan Tr. 130:20-21, 304:22-24. Mr. Sammon similarly recalled that Ms. Mulligan "wasn't convinced that she wanted to transfer," and expressed openness to it only after she was reminded that the law firm had recommended it. Sammon Tr. 105:11-20, ECF No. 45-9. Plaintiff explains that she set up interviews with other departments only because she felt that if the town was going to force her to transfer, she wanted to "see what goes on there" and "try to make the better selection." Mulligan Tr. 130:21-22; Mulligan Aff. ¶ 16.

Around this time, she texted her union representative asking if she could reject a transfer if it wasn't what she wanted. Sethi Decl., Ex. 19 at 353, ECF No. 54-19. When she emailed her DGS colleagues, Ms. Mulligan points out, she stated that she was "sad to announce" that she was leaving the department. Ex. EE at 265. Finally, Ms. Mulligan attests that no one ever informed her that she needed to make a request to transfer her civil service exam score, and points to a portion of Mr. Sammon's deposition in which he stated that he could not recall whether such a requirement was standard. Mulligan Aff. ¶ 22; Sethi Decl., Ex. 3 at 67:1-22 ("Sammon Tr."), ECF No. 54-3.

Eventually, Ms. Mulligan transferred to the Department of Occupations Resources ("DOOR"). Pl.'s Response ¶ 116. For some period of time—the parties dispute how much, *compare* Mulligan Aff. ¶ 21 (a year), *with* Mallette Aff. ¶ 10, ECF No. 45-4 (only a "short" period of time)—she performed the duties of a receptionist, which she perceived as a far cry from her previous position, Mulligan Aff. ¶ 19. As a result of the transfer, Ms. Mulligan no longer had a designated computer, parking spot, or private office. *Id*; Sethi Decl., Ex. 17 at 111, ECF No. 54-17. The new position also meant that her hours were no longer compatible with her second job as a waitress. Mulligan Aff. ¶ 19; Ex. 17 at 111–12.

About a year after she transferred to DOOR, Ms. Mulligan asked DOOR's commissioner for a promotion based on her civil service exam score. Mallette Aff. ¶¶ 3, 15. DOOR's commissioner told her that he submitted a request to Human Resources, but he later learned that she was no longer eligible for promotion because she had never made a written request to transfer her score from DGS to DOOR. Mallette Aff. ¶¶ 16–18.

Plaintiff commenced this action against Mr. Marino and the Town; defendants filed an Answer denying her allegations and asserting a number of affirmative defenses, one of which alleged that Ms. Mulligan failed to avail herself of the Town's grievance policies. Answer ¶ 144,

ECF No. 21. During a pre-motion conference, defendants agreed that they would not seek summary judgment on plaintiff's hostile work environment claims;[2] they also conceded that Mr. Marino is a supervisor for the purposes of liability for plaintiff's Title VII claims. *See* Docket Entry Dated March 8, 2023. The instant cross-motions for summary judgment followed. *See* ECF Nos. 45–46, 51, 54–57.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56. In determining whether there are any genuine issues of material fact, I must "examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Id*. If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[M]ere speculation or conjecture as to the true nature of the facts"

---

[2] Defendants did not brief this issue. *See generally* Defs.' Mot. In their reply, however, they suggest that one of plaintiff's arguments against summary judgment on her retaliation claim—that there was no safety or security justification for transferring her to a different department, given that the Russo Report deemed her allegations of harassment to be unfounded, *see* Pl.'s Opp'n 22—"perhaps[] negates any issue of fact regarding [p]laintiff's hostile work environment claim." Defs.' Reply in Support of Mot. Summ. J. & in Opp. to Cross-Mot. 10, ECF No. 46-8. As I explain in this opinion, *see infra* Section II, plaintiff has the better argument on the safety or security point, so this argument does not indeed "negate[] any issue of fact" regarding the hostile work environment claim. Moreover, the parties still have not briefed this issue, despite defendants' aside in their reply. I accordingly decline defendants' invitation to decide the hostile work environment claim.

is insufficient to overcome a motion for summary judgment. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

The Second Circuit has urged "an extra measure of caution . . . in affirming summary judgment in a discrimination action" involving harassment or retaliation, "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

## DISCUSSION

### I.   Defendants Are Entitled to Summary Judgment on Plaintiff's *Quid Pro Quo* Harassment Claims.

*Quid pro quo* sexual harassment "occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) (quoting 29 C.F.R. § 1604.11(a)(2)). "The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Id.* at 778. Claims of *quid pro quo* sexual harassment, like other claims of sexual harassment that plaintiffs seek to prove without direct evidence, are generally subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Clarke v. Pacifica Found.*, No. 07-CV-4605 (FB), 2011 WL 4356085, at *8 (E.D.N.Y. Sept. 16, 2011). Under this framework, a plaintiff must establish a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). A

plaintiff seeking relief for *quid pro quo* sexual harassment must additionally "present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001) (quotation marks omitted). The adverse employment action must be "tangible . . . i.e., . . . an explicit alteration in the terms or conditions of employment result[ing] from her refusal to submit to [unwanted] sexual advances." *Schiano*, 445 F.3d at 604 (cleaned up).  If the plaintiff meets this minimal burden, the employer must then "articulate some legitimate, nondiscriminatory reason" for the challenged conduct. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to prove that the employer's reason "was in fact pretext" for discrimination. *Id.* at 804.[3]

Plaintiff's *quid pro quo* claims focus on the events surrounding her proposed promotion being removed from the Town Board agenda in 2018: She contends that Mr. Marino "intervened to deny her the promotion until she complied with his sexual demands." Pl.'s Opp'n 9. The parties' dispute centers around causation—that is, whether Ms. Mulligan's rejection of Mr. Marino was "used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Fitzgerald*, 251 F.3d at 356. Defendants contend that "the uncontroverted evidence shows Commissioner Marino had absolutely no role in the decision-making process," so "no reasonable jury could find that the Town's decision was, in any way, connected or tied to [p]laintiff's acceptance or rejection of the Commissioner's alleged sexual overtures." Defs.' Mem. L in Supp. Mot. for Summ. J. 16–17 ("Defs.' Mot."), ECF No. 45-43. Plaintiff, on the other hand, essentially posits that a reasonable juror could conclude that Mr. Marino was involved in the

---

[3] "[I]dentical standards apply to employment discrimination claims brought under" Title VII and the New York State Human Rights Law. *Weinstock*, 224 F.3d at 42 & n.1. I accordingly analyze plaintiff's state and federal *quid pro quo* claims together.

decision to remove her proposed promotion from the Town Board agenda. *See* Pl.'s Opp'n 9–16. Her arguments in support of this position are unpersuasive.

The evidence in the record shows that Mr. Marino's only involvement in the promotion process was his advocacy for Ms. Mulligan, both before and after her promotion was removed from the Board agenda. *See* Ex. L (recommendation letter); Marino Tr. 302:13–303:8, ECF No. 45-8 (testimony that Mr. Marino kept seeking Ms. Mulligan's promotion until 2019); Cianciulli Aff. ¶ 13 (affirmation that Mr. Marino continued advocating for Ms. Mulligan after March 2018). The record also contains sworn statements from Mr. Cianciulli and Mr. Sammon that Mr. Cianciulli and Mr. LaCarruba decided not to move forward with Ms. Mulligan's promotion in March 2018 because she had received several recent pay increases. Cianciulli Aff. ¶¶ 8, 11; Sammon Tr. 80:6-20, 82:5-25, ECF No. 45-9.

Plaintiff's attempts to elucidate genuine fact disputes are unavailing. First, although plaintiff correctly notes that the record is inconsistent as to whether she received three or four pay raises in the year preceding her proposed promotion, *compare* Sethi Decl., Ex. 11 at 135 (three), ECF No. 54-11, *with id*., Ex. 29 at 904 (four), ECF No. 54-29, this inconsistency is not material: Mr. Cianciulli and Mr. LaCarruba were concerned that she had received "*at least three* raises fairly recently." Sammon Tr. 82:7-8, ECF No, 45-9; *see also* Cianciulli Aff. ¶ 11 (citing general concerns regarding the "frequency and recency" of Ms. Mulligan's raises). The fact that she may have received three raises rather than four is therefore inconsequential, because any "implication of discrimination evoked by this minor discrepancy . . . is too tenuous to create a genuine issue of material fact." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 458 (S.D.N.Y. 2011).

Second, the fact that Mr. LaCarruba purportedly stated that he did not know why Ms. Mulligan's promotion was tabled does not create a genuine fact dispute. As an initial matter, that

statement was noted in an unsworn, un-transcribed interview with the investigating law firm.[4] Russo Report at 408. Moreover, Mr. LaCarruba did not dispute the reasons offered by Mr. Sammon and Mr. Cianciulli for tabling Ms. Mulligan's promotion—reasons that were echoed by contemporaneous Human Resources notes. *See* Napolitano Decl., Ex. Q, ECF No. 45-21 (excerpt from the Human Resources database stating that on March 15, 2018, Ms. Mulligan's promotion was "pulled from the 3/20/18 calendar per [Mr. Sammon]," and noting as of March 28, 2018 that the promotion should be "h[e]ld until further notice, 4 steps in less than a year"). Any inconsistency created by Mr. LaCarruba's apparent failure to remember, over a year later, why Ms. Mulligan's promotion had been tabled "is insufficient to raise a material issue of fact . . . because the evidence is minor and inconclusive as compared to the overwhelming evidence that [d]efendant[s] chose not to [promote] [p]laintiff for exactly the reason they stated, i.e. due to" the fact that she had received too many raises in the previous year. *Sarmiento v. Queens Coll. CUNY*, 386 F. Supp. 2d 93, 105 (E.D.N.Y.), *aff'd*, 153 F. App'x 21 (2d Cir. 2005).

Next, in an attempt to suggest that Mr. Marino was involved in the decision to table her promotion, plaintiff points to the fact that the Human Resources database references his involvement—but the exhibit she cites states only that Mr. Marino requested Ms. Mulligan's promotion in early March 2018; that Mr. Sammon informed Mr. Marino that she would not be

---

[4] Defendants' motion suggests that the parties dispute the admissibility of the interview notes in the Russo Report, and plaintiff did argue in advance of the pre-motion conference that these notes are inadmissible hearsay. Defs.' Mot. 19 n.9; Response to Defs.' Local Rule 56.1 Statement 3–4, 22–23, 27, 29, ECF No. 37. Plaintiff makes no such argument in her opposition, cross-motion, or reply in support of her cross-motion, however, and indeed frequently relies upon the notes. *See* Pl.'s Opp'n 1 n.2; *id.* at 1, 3–8, 12, 17, 25–26, 28, 30–33, 37; Pl.'s Reply in Support of Cross-Mot. 4, ECF No. 57. Any objection to the admissibility of the report is therefore waived. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (deeming an objection to the admissibility of evidence waived where both parties relied on the evidence in their summary judgment briefing).

promoted because she had received several raises in less than a year; and that Mr. Marino continued to seek her promotion. Ex. Q. This does not create a fact dispute as to whether Mr. Marino was involved in deciding not to promote Ms. Mulligan; if anything, it suggests that he continued to advocate for her promotion after March 2018. Similarly, plaintiff characterizes Mr. Sammon as having testified that Mr. Marino "was an active part of the Town's decision," Pl.'s Opp'n 14, but the testimony she cites states only that the Commissioner was "very enthusiastic about trying to get a promotion for Dana" and that he continued to try to get her promoted after March 2018; again, this fails to suggest anything other than that Mr. Marino wanted Ms. Mulligan to be promoted. Sammon Tr. 89:3–20, ECF No. 45-9. Plaintiff's reference to Mr. Marino's purported "admi[ssion] that he was in regular communication with the Town regarding the promotion," Pl.'s Opp'n 14, cites only to his testimony that he "called more than once" to encourage her promotion, and that he continued calling "until May of 2019," Marino Tr. 302:13–303:8, ECF No. 45-8. In short, each of plaintiff's attempts to suggest that Mr. Marino was involved in withdrawing her promotion suggests the exact opposite, and certainly does not create a genuine fact dispute.

Plaintiff offers two additional theories of how a juror might conclude that Mr. Marino was involved in the decision to not promote her. First, she argues that the temporal proximity between her rejection of Mr. Marino's dinner invitation and the removal of her promotion from the Board agenda creates an inference of causation. Pl.'s Opp'n 11. It is true that "temporal proximity between the rejection of the sexual advance and the adverse employment action can lead to . . . an inference that the plaintiff was subject to *quid pro quo* sexual harassment." *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 554 (E.D.N.Y. 2015), *aff'd,* 648 F. App'x 130 (2d Cir. 2016). Here, however, there is insufficient evidence in the record to permit such an inference. The record indicates the

13

following:

- Mr. Marino sent his letter advocating for Ms. Mulligan's promotion on March 1, 2018. Ex. L.
- Mr. Cianciulli, Mr. LaCarruba, and Mr. Sammon met at some point between March 6 and March 18, 2018 to discuss the proposed promotion. Ex Q; Cianciulli Aff. ¶ 8.
- Mr. Marino's birthday was on March 25. Mulligan Aff. ¶ 11.

Plaintiff she does not specify when Mr. Marino asked her to go to dinner with him, or when she rejected him—she states only that "[t]ypically he would use his birthday as an excuse to hound [her] to go out to dinner alone with him," and that she "didn't go out to dinner with him in March 2018 and didn't give in to his sexual advances." Mulligan Aff. ¶¶ 11–12. Without more details, it seems equally plausible that Mr. Marino invited Ms. Mulligan to dinner before he sent the March 1 recommendation letter, after he sent the letter but before the meeting at which her promotion was tabled, or after that meeting. Her rejection similarly could have occurred in any one of these timeframes. It is too great a leap to infer from this minimal evidence that Mr. Marino invited Ms. Mulligan to dinner before the pivotal meeting, or that she rejected him after he had expressed his support for her but before the decision was made—particularly given uncontroverted evidence that Mr. Marino continued to push for Ms. Mulligan's promotion after his birthday had passed. *See* Cianciulli Aff. ¶ 13; Marino Tr. 302:13–303:8, ECF No. 45-8.

Plaintiff next points to two text message exchanges that she argues evince *quid pro quo* sexual harassment. The first is an exchange from January 2016, in which Ms. Mulligan told Mr. Marino, "if [the chairman] wants to give me a step it's all ok with me!" and Mr. Marino responded, "I will. Your 14 is sometime I hope soon." Ex. 19 at 636. Read in context, it appears that Ms. Mulligan was asking Mr. Marino to advocate for her to receive a salary increase, and he replied that she would receive that increase at some point soon. In the next exchange, from February 2019, Ms. Mulligan expressed frustration with Mr. Marino over a number of things, including her

perceived lack of recognition in the local political club of which they were both members and the fact that she had not yet been promoted within DGS. Most relevantly, she wrote, "[I'm] very sad that someone g[o]t hired off the street and will make [$]120,000. And you tell me you can't get me a tested title!!"[5] *Id.* at 666. Mr. Marino responded, "Then let's part ways. I'm sorry. This is ridiculous." *Id.* Ms. Mulligan in turn said, "You['re] always right…[]maybe we should part ways..[.] This is because [I] told you to stop…at least [I] know my guts were right … I will find another club." *Id.* at 667. Although it is unclear what Ms. Mulligan meant by "this is because I told you to stop," and it is perhaps a fair inference that she was referring to her rejection of his sexual advances, these exchanges shed no light on why she was not promoted in 2018. Mr. Marino's expressed desire to part ways in February 2019 has no bearing on whether he wanted to continue working with Ms. Mulligan in March 2018. And his suggestion in 2016 that she would receive a promotion soon suggests little other than the fact that, as the record shows elsewhere, he advocated for her promotion through at least 2018. The second exchange certainly shows a souring of the relationship—but it says nothing about what prevented her promotion in March 2018, and certainly does not contradict evidence in the record that her promotion was tabled because of the number of raises she had recently received.

The parties' arguments about causation bleed into their arguments about pretext: Defendants contend that even if plaintiff established a *prima facie* case of sexual harassment, they have offered a nondiscriminatory reason for not promoting her (the several recent salary increases); plaintiff in turn argues that the jury could conclude that this was pretextual. Defs.' Mot. 17–18; Pl.'s Opp'n 11–16; *see McDonnell Douglas*, 411 U.S. at 802, 804. I have addressed all of the

---

[5] "Tested title" appears to be a reference to a position earned by one's performance on the civil service exam.

parties' arguments except for one: plaintiff's contention that a reasonable juror could infer that defendants' proffered justification was pretextual because the Board promoted another worker despite citing budgetary reasons for not promoting her. Pl.'s Opp'n 13; *see* Ex Q; Ex. 22 at 7, ECF No. 54-22. A plaintiff can raise a fact question regarding pretext by presenting evidence that she was treated less favorably than similarly situated comparators. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567–68 (2d Cir. 2000), *superseded by statute on other grounds*. Here, however, plaintiff has offered no evidence whatsoever to suggest that she and the promoted worker were indeed similarly situated—that, for example, he was eligible for a similar promotion based on his civil service exam score, or that he had also received several recent raises but was nonetheless given another promotion. The mere fact that the Board promoted another worker when it declined to promote Ms. Mulligan is insufficient to permit an inference of pretext.

In sum, plaintiff has failed to present evidence that her reaction to Mr. Marino's alleged advances was "used as the basis for" the decision to table her promotion. *Fitzgerald*, 251 F.3d at 356. Quite the contrary, defendants have articulated a "legitimate, nondiscriminatory reason" for not promoting her—the fact that she had received several recent raises—and plaintiff has not shown that this reason "was in fact pretext" for *quid pro quo* harassment. *McDonnell Douglas*, 411 U.S. at 802, 804. I accordingly grant defendants' motion for summary judgment on plaintiff's *quid pro quo* harassment claims.

## II.   Genuine Issues of Fact Preclude Summary Judgment on Plaintiff's Retaliation Claims.

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,

716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quotation marks omitted). In the Second Circuit, a lateral transfer may constitute a materially adverse action "if the reassignment would have been viewed by a reasonable employee as" such. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010). Under this objective test, "an employment action is materially adverse if it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). A plaintiff who voluntarily transfers is not precluded from establishing a *prima facie* case of retaliation, *see Richardson v. N.Y. State Dep't of Correctional Serv.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds, Burlington N.*, 548 U.S. 53, but she may face a higher bar in doing so, *see Chanval Pellier v. British Airways, Plc.*, No. 02-CV-4195 (DGT), 2006 WL 132073, at *5 (E.D.N.Y. Jan. 17, 2006) (holding that a voluntary transfer is not an adverse employment action unless it amounts to constructive discharge); *Davis v. NYS Dep't of Corrs. Attica Corr. Facility*, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014) (same). If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to provide a non-discriminatory justification for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000). The plaintiff then has the burden of proving that the defendant's proffered explanation is pretextual. *Id.* at 143.[6]

Plaintiff's retaliation claims focus on the events surrounding her report of harassment via Mr. Seifert, the law firm's investigation and conclusion that she was not credible, and the Town's decision to transfer her to a different department. The parties first dispute whether Ms. Mulligan's transfer from DGS to DOOR was in fact an adverse action. Defendants argue that the transfer was

---

[6] As with plaintiff's *quid pro quo* claims, I analyze her state and federal retaliation claims together. *See Weinstock*, 224 F.3d at 42 & n.1.

not an adverse action because Ms. Mulligan voluntarily accepted it, although the non-binding cases they cite do not stand for the proposition that voluntary transfers are never adverse, and defendants do not address whether Ms. Mulligan's transfer amounted to constructive discharge. *See Chanval Pellier*, 2006 WL 132073, at \*5; *Davis*, 46 F. Supp. 3d at 236–37. Even if defendants' position were supported by authority and argument, however, summary judgment would not be warranted because there are genuine fact issues as to whether Ms. Mulligan's transfer was indeed voluntary, and whether it was in other ways materially adverse. The record tells two different stories: In one version, Ms. Mulligan willingly interviewed with other departments, enthusiastically informed her colleagues of her impending transfer, and generally expressed her openness to transferring, *see* Sammon Tr. 115:21–116:7, ECF No. 45-9; Ex. HH; Ex. EE; Kataeva Tr. 80:12-19, ECF No. 45-10; in the other, Ms. Mulligan adamantly did not want to transfer, interviewed with other departments only to make the best out of a bad situation, and expressed sadness in her email to her colleagues, *see* Mulligan Tr. 130:20-22, 304:22-24; Mulligan Aff. ¶ 16; Ex. EE. A reasonable trier of fact could credit Ms. Mulligan's version of the facts over defendants' and conclude that her transfer was not voluntary.

There are also materially disputed facts as to whether Ms. Mulligan's transfer might otherwise "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kaytor*, 609 F.3d at 555. At DGS, Ms. Mulligan's duties included scheduling meetings, taking attendance, providing employees with parking spots, and reporting to Mr. Marino on the status of certain projects; Defs.' Statement ¶ 34; she was viewed by some as Mr. Marino's "right hand," with corresponding responsibility. Flanagan Decl. ¶ 29; Seifert Tr. 74:13-18, ECF No. 54-4; Marino Tr. 222:3-14; 223:2-9, ECF No. 54-1. Upon her transfer to DOOR, Ms. Mulligan no longer had a personal computer or private office; she worked as a receptionist; and she could

no longer work her second job as a waitress. Ex. 17 at 111–12 Mulligan Aff. ¶¶ 18, 21. Defendants say that Ms. Mulligan worked as a receptionist only for a "short" period of time, Mallette Aff. ¶ 10, but Ms. Mulligan stated that she served in that role for a year, Mulligan Aff. ¶ 21, and defendants have not offered a different time frame. A reasonable juror could conclude that a year is not a short period of time. And although Mr. Sammon testified that Ms. Mulligan had an injury at the time of her transfer that prevented her from working her second job, Sammon Tr. 119:2-25, ECF No. 54-3, Ms. Mulligan's diary entry suggests that the DOOR transfer did indeed cause her to lose that job, Ex. 17 at 112 ("I lost one seasonal job because of my new later schedule. That's my [Christmas] money. I won't see that money again?"). A reasonable trier of fact could credit Ms. Mulligan's version over Mr. Sammon's. Finally, there is the matter of Ms. Mulligan's eligibility for promotion based on her civil service exam score: Laura Ra stated that she informed Ms. Mulligan that she must submit a written request to transfer her score from DGS to DOOR, Laura Ra Aff. ¶¶ 13–15, but Ms. Mulligan stated that she was never informed of this requirement, Mulligan Aff. ¶ 22; she also points to a portion of Mr. Sammon's deposition in which he could not recall whether other employees were required to make such written requests, Sammon Tr. 67:1-22, ECF No. 54-3. A juror could reasonably conclude that there was no such formal requirement, and that Ms. Mulligan was not informed that she needed to take certain steps to preserve her promotion eligibility upon her transfer.

In sum, a reasonable trier of fact could conclude that Ms. Mulligan's transfer to DOOR stripped her of significant responsibilities for a year; led to the loss of her second job; and made her ineligible for the promotion she had long sought. That trier of fact could in turn conclude that that these circumstances would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," and were therefore materially adverse. *Kaytor*, 609 F.3d at 555; *see*

19

*also id.* at 555–56 (finding a genuine issue of fact as to whether an action was adverse where a transfer resulted in the employee losing significant responsibilities and having "no work to do"); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006) (vacating summary judgment where an employee's transfer stripped him of his prior responsibilities and required him "to do work normally performed by clerical and lower-level personnel").

Defendants also argue that plaintiff cannot establish the requisite causation, but their position is unpersuasive. They focus on the four-month time lapse between Ms. Mulligan's complaint to Mr. Seifert and her ultimate transfer to DOOR, citing caselaw that they contend establishes that causation cannot be inferred from a lapse of any longer than two months. Defs.' Mot. 21; *see Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401 (DRH), 2013 WL 4899723, at *10 (E.D.N.Y. Sept. 11, 2013) (collecting cases). But this argument misses the mark: Plaintiff does not need to rely on temporal proximity to establish causation. The parties agree that Ms. Mulligan was transferred because the Russo Report recommended that she and Mr. Marino be separated—indeed, this is the purportedly non-discriminatory reason that defendants offer for the transfer. *See* Defs.' Mot. 21–23. The Russo Report came to exist only because Ms. Mulligan reported Mr. Marino's alleged sexual harassment, initiating a reporting process that led to the law firm's retention. *See* Mulligan Tr. 226:13-22; Russo Report at 325, 343. The chain of causation between plaintiff's protected activity and any adverse action is therefore quite clear: But for her report to Mr. Seifert, the Town would not have transferred her on the Russo Report's recommendation. At the very least, a reasonable trier of fact could conclude that "there was a causal connection between the protected activity and [any] adverse action." *Kelly*, 716 F.3d at 14.

Defendants contend that summary judgment is nonetheless warranted because they have demonstrated a non-discriminatory reason for transferring Ms. Mulligan—to separate her from her

alleged harasser. But their argument is logically inconsistent. Defendants rely on the Russo Report for two conflicting propositions: first, that plaintiff's allegations of harassment were unfounded, and second, that she needed to be separated from Mr. Marino because of that harassment. If defendants do not believe that Mr. Marino in fact harassed Ms. Mulligan, however, then it is unclear why they thought that the two needed to be separated unless Ms. Mulligan had affirmatively requested it—which no one argues. Plaintiff persuasively points out this logical flaw, noting that because defendants deemed her claims to be unfounded, they could not have simultaneously thought there were legitimate safety or security concerns necessitating her transfer. Pl.'s Opp'n 22. Defendants, meanwhile, rely on several cases in which plaintiffs *requested* to be separated from their alleged harassers, *Malone v. Town of Clarkstown*, No. 19-CV-5503 (VB), 2022 WL 2834105, at *5 (S.D.N.Y. July 20, 2022); *Loris v. Moore*, No. 04-CV-1036 (WWE), 2008 WL 3891730, at *6, *14 (D. Conn. Aug. 20, 2008), *aff'd*, 344 F. App'x 710 (2d Cir. 2009); *Sawyer v. Nicholson*, No. 06-CV-5907, 2010 WL 4510954, at *6, 20 (N.D. Ill. Nov. 1, 2010). The last case upon which defendants rely, *McCoy v. Macon Water Authority*, 966 F. Supp. 1209 (M.D. Ga. 1997), is minimally reasoned: There, the court simply wrote that it "fail[ed] to understand how it could be harassment that Plaintiff was transferred away from the supervision of the man who, according to Plaintiff, had sexually harassed him." *Id.* at 1221. I do not share that court's confusion. If an employer does not believe that any harassment happened, then transferring the plaintiff against her will more resembles an attempt to keep her from filing future complaints than an effort to keep her safe. At the very least, a reasonable juror could conclude that the Town's proffered justification for transferring Ms. Mulligan was insincere.

For the foregoing reasons, I conclude that there are genuine fact issues regarding whether plaintiff's transfer was voluntary and whether it constituted a materially adverse action; I further

hold that defendants' stated justification for the transfer is insufficient to defeat summary judgment. Defendants' motion for summary judgment on plaintiff's retaliation claims is accordingly denied.

### III. The Town Is Not Entitled to the *Faragher/Ellerth* Defense at This Stage of the Litigation.

Typically, a supervisor's "objectionable conduct" is "imputed to the employer"—but an employer may avoid liability by demonstrating that "(1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). This defense, known as the *Faragher/Ellerth* defense, is not available "when 'the supervisor's harassment culminates in a tangible employment action'"—that is, when a tangible employment action is "linked to the supervisor's discriminatory harassment." *Ferraro v. Kellwood Co*, 440 F.3d 96, 102 (2d Cir. 2006) (quoting *Faragher*, 524 U.S. at 808, and *Ellerth*, 523 U.S. at 765). New York law does not recognize the *Faragher/Ellerth* defense; it therefore has implications only for plaintiff's Title VII retaliation claim. *See* N.Y. Exec. L. § 296(1)(h).

Defendants contend that even if issues of material fact exist regarding plaintiff's retaliation claim, the Town is entitled to judgment as a matter of law based on the *Faragher/Ellerth* defense. As an initial matter, I note that defendants very well may have waived this defense by failing to raise it adequately in their Answer: They stated only that Ms. Mulligan "failed to avail herself of the Town's grievance procedures," referring to the second prong of the defense but saying nothing of the first. Answer ¶ 144. *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63

(2d Cir. 2021) (noting that under Federal Rule of Civil Procedure 8(c), affirmative defenses "are waived unless they are raised in a responsive pleading"); *see Harness v. Anderson Cnty., Tennessee*, No. 21-5710, 2023 WL 4482371, at *6 (6th Cir. July 12, 2023) (deeming the *Faragher/Ellerth* defense waived where the defendant asserted only the second prong). *But see Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1258 (11th Cir. 2014) (concluding that a pleading of "failure to mitigate" sufficiently raises the defense). I need not resolve the waiver issue, however, because even if defendants did not waive the defense, they cannot rely on it at this stage—although not for all of the reasons that plaintiff offers.

Plaintiff argues that defendants cannot invoke the *Faragher/Ellerth* defense because Mr. Marino's harassment culminated in an adverse action: the denial of her promotion. Pl.'s Opp'n 23; *see Ferraro*, 440 F.3d at 101–02. But this argument fails because, as I have discussed, plaintiff has not presented a triable issue of fact regarding Mr. Marino's purported involvement in the promotion decision. Nor does Ms. Mulligan's transfer to DOOR constitute an adverse action for the purposes of the *Faragher/Ellerth* defense. Even though Mr. Marino's alleged harassment of Ms. Mulligan may have been the but-for cause of Mr. Mulligan's transfer, more than but-for causation is required to preclude an employer from invoking the defense. *See Ferraro*, 440 F.3d at 101–02 (reasoning that the adverse action must be "be part of the supervisor's discriminatory harassment" and explaining that the defense is concerned with whether "the official power granted by the employer to the supervisor was used to harass the employee"). Because Mr. Marino was not personally involved in Ms. Mulligan's transfer, that transfer—if indeed an adverse action— does not preclude defendants from raising the defense.

That said, there are genuine fact questions as to whether the Town "exercised reasonable care to prevent and correct promptly" any harassment, as well as whether plaintiff "unreasonably

failed to take advantage" of any preventative or corrective opportunities. *Gorzynski*, 596 F.3d at 103. Regarding the first prong of the *Faragher/Ellerth* defense, defendants emphasize that they had an anti-harassment and reporting policy, *see* Napolitano Decl., Ex. S, ECF No. 45-23—but although courts place "substantial weight . . . on the existence of an adequate anti-harassment policy and the promulgation of reporting procedures," *Cajamarca v. Regal Ent. Grp.*, 863 F. Supp. 2d 237, 249 (E.D.N.Y. 2012), such systems are "not necessarily dispositive," *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) (overruled on other grounds). Rather, the Supreme Court has instructed courts to take a totality of the circumstances approach, considering facts such as whether an employer "monitor[ed] the workplace," "respond[ed] to complaints," "provide[d] a system for registering complaints," or "effectively discouraged complaints from being filed." *Vance v. Ball State Univ.*, 570 U.S. 421, 449 (2013). Plaintiff argues that, viewed through this lens, defendants' policies and procedures were inadequate.

First, Ms. Mulligan asserts that there is no proof that the Town offered regular sexual harassment trainings before the commencement of this litigation. Pl.'s Opp'n 24–25. Indeed, most of the evidence in the record reflects trainings beginning in 2019, *see* Ex. U, Napolitano Decl., ECF No. 45-25, although Ms. Mulligan does appear to have signed a form acknowledging such a training in 2010, *see id.*, Ex. T, ECF No. 45-24, and Mr. Marino stated in his deposition that he attended one training in 2017, Marino Tr. 74:4-13, ECF No. 45-8. It is an open question in the Second Circuit whether employers must train employees on their policies to invoke the *Faragher/Ellerth* defense. *Compare Zakrezewska v. The New Sch.*, 598 F. Supp. 2d 426, 433 (S.D.N.Y. 2009), *with Pugni v. Reader's Dig. Ass'n, Inc.*, No. 05-CV-8026, 2007 WL 1087183, at *18 (S.D.N.Y. Apr. 9, 2007). At a minimum, however, the existence (or lack thereof) of trainings can help inform a court's analysis of whether an employer's policies were meaningfully

disseminated and enforced—and here, a trier of fact could reasonably conclude that the Town did not undertake significant efforts to publicize its policies until plaintiff sued.

Next, Ms. Mulligan argues that the Town's reporting mechanism was inadequate because employees did not feel safe complaining, given that complaints frequently resulted in complainants being transferred to less favorable locations. Pl.'s Opp'n 25. She cites to other employees' expressions of awareness of an environment of retaliation and/or fear of reporting. *See, e.g.*, Flanagan Decl. ¶ 20 ("I was reluctant to [report] because I know the Town's m.o.: they keep people in line with the constant fear of retaliation . . . . If you don't want to be transferred or fired, you need to watch your step and not speak out."); ██████████████████████████

██████████████████████████████.[7] Plaintiff also references specific examples, such as Mr. Seifert's testimony that when Ms. Natoli complained about sexual harassment to Mr. Marino, the Commissioner told her that he would not help her. *See* Seifert Tr. 130:14-24, ECF No. 54-4. Ms. Mulligan contends that Ms. Natoli was subsequently transferred to a less desirable location, although this point is not entirely supported from the record: Mr. Seifert testified that although she was transferred to the phone room, he did not know "if it was to put the fire out that was going on up there to get her away from people or if it was or another reason," *id.* at 134:12-19; ████████████████████████████████

██████████████████████████████████████████

---

[7] Plaintiff also cites to a portion of Mr. Seifert's deposition in which he purportedly said, "Oh yeah, I am afraid of retaliation . . . [because of] [p]ast instances I have seen of people being moved or just messed around with or, you know, paid more attention to, like to just try and catch you doing something." Pl.'s Opp'n 28. This portion of the deposition, however, is not in the record presented by the parties in their motions. *See generally* ECF Nos. 45-11, 54-4. Similarly, plaintiff describes an employee who withdrew a complaint because she was "a mother of 2 and works 3 jobs and didn't want any problems and was concerned about losing her small salary," Pl.'s Opp'n 28; the exhibit she points to, however, does not contain this example, *see generally* Ex. 19.

████████████████████████████████████████. The evidence regarding Ms. Natoli's transfer is quite vague, and it is difficult to conclude one way or another whether the transfer appeared retaliatory.

Plaintiff similarly argues that Mr. Seifert was transferred after he reported harassment; although it is again unclear from the record whether any transfer was retaliatory, there is stronger evidence here than for Ms. Natoli. On the one hand, one employee stated in his declaration that Mr. Seifert "was not happy about the transfer," Flanagan Decl. ¶ 22; on the other hand, ██████ █████████████████████████████████████████████████████████████████ ████ and Mr. Seifert himself said in his deposition that he wanted his current position because it paid more money than his previous position, Seifert Tr. 31:9-17, ECF No. 54-4. It is unclear whether the latter two records refer to the same transfer discussed by Mr. Flanagan—a reasonable juror could conclude from this evidence that Mr. Seifert was transferred against his will after reporting, and subsequently received a new position that he desired.

Plaintiff also points to the complaint by custodian LaPierre asserting that after she reported harassment to Mr. Marino, she was transferred to work in an unpleasant location surrounded by only male coworkers. Ex. 20. When pressed about this employee, Mr. Marino acknowledged that she was moved but said that he did not know why; the deputy town attorney, meanwhile, said that she thought "there was a departmental need for a cleaner to be there." Marino Tr. 124:22–125:6, ECF No. 54-1; Kataeva Tr. 30:18-25, ECF No. 54-5.

Although some of these examples are stronger than others, a trier of fact could reasonably credit the facts that favor plaintiff over those that favor defendants and conclude that harassment complaints were not taken seriously or were met with retaliation.

Finally, plaintiff argues that the Town's procedures were not reasonable because the Town failed to take prompt action following her complaint. Pl.'s Opp'n 25–26. Defendants in turn note that the Town took corrective action upon receiving Ms. Mulligan's complaint by initiating an investigation and having Mr. Marino work from a different location during the pendency of the investigation. *See* Kataeva Tr. 57:12-19, 64:23–65:2, ECF No. 45-10; Marino Tr. 319:18-24, ECF No. 45-8. Indeed, the Russo Report concluded that Ms. Natoli's and Ms. Mulligan's complaints "were not investigated in a prompt and timely manner," correctly noting that although Mr. Seifert complained on behalf of Ms. Natoli on April 22, 2019 and on behalf of Ms. Mulligan on May 10, 2019, the Town did not hire an investigator until June 2019. Russo Report at 336; *see* Pl.'s Opp'n 25–26; Pl.'s Response ¶ 63. There is no bright-line rule establishing how quickly an employer must respond to complaints to establish the first prong of the *Faragher/Ellerth* defense, but courts have denied summary judgment where employers waited at least a week to commence an investigation. *See, e.g.*, *Seepersad v. D.A.O.R. Sec., Inc.*, No. 97-CV-2086 (SS), 1998 WL 474205, at *5 (S.D.N.Y. Aug. 12, 1998); *McArdle v. Arms Acres, Inc.*, No. 03-CV-5721 (PGG), 2009 WL 755287, at *10 (S.D.N.Y. Mar. 23, 2009). Although a reasonable trier of fact might well conclude that the Town responded promptly to Ms. Mulligan's report, I cannot conclude as much as a matter of law.[8]

Although defendants had an anti-harassment policy and accompanying complaint procedure, which can be enough to satisfy the first prong of the *Faragher/Ellerth* defense, *see Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001), plaintiff has put forward evidence

---

[8] Plaintiff also argues that the Town's reporting and investigative procedures were unreasonable because they failed to protect her anonymity. Pl.'s Opp'n 26. The Town's policy did not guarantee confidentiality, however, and the Second Circuit has held that a policy need not do so to satisfy the first prong of the *Faragher/Ellerth* defense. Ex. S at 425; *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001).

that could permit a reasonable juror to conclude that the town did not exercise reasonable care to prevent or correct harassment. If, for example, a juror believed that there was minimal harassment training prior to 2019, employees were reluctant to report because they feared retaliation, and the investigation process was untimely, that juror might reasonably conclude that the Town's efforts were insufficient, notwithstanding the existence of a policy and complaint procedure. *See Vance*, 570 U.S. at 448–49 (noting that a plaintiff could prevail by showing, among other things, that her employer "failed to respond to complaints" or "effectively discouraged complaints from being filed"). Disputed issues of fact therefore prevent defendants from establishing the first prong of the *Faragher/Ellerth* defense at this stage, although they may be able to do so at trial.

For similar reasons, defendants cannot establish the second prong of the defense at this stage. Plaintiff argues that it was not unreasonable for her to delay reporting Mr. Marino's alleged harassment because she possessed a credible fear of retaliation given the concerns and experiences of her colleagues described above. Pl.'s Opp'n 27–29. When an employer "satisfie[s] its initial burden of demonstrating that an employee has . . . failed to avail herself of the complaint procedure," the burden shifts to the employee to offer a justification. *Leopold*, 239 F.3d at 246. An employee can satisfy that burden by producing evidence "that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Id*. Plaintiff has, as discussed above, pointed to several examples of employees who reported sexual harassment and were transferred. Although it is unclear whether each of those instances indeed constituted retaliation, there are at least genuine fact questions as to whether the Town took prior complaints seriously or took adverse action against employees who reported harassment. The Town therefore cannot establish the second prong of the *Faragher/Ellerth* defense at this stage, although, again, it may be able to do so at trial.

28

## IV.   Plaintiff Has Not Identified Evidence Sufficient to Show that the Town Had a Policy or Custom of Harassment.

Plaintiffs suing for sex-based discrimination in public employment are not limited to Title VII and analogous state laws: They may also sue under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. *Legg v. Ulster Cnty.*, 979 F.3d 101, 116 (2d Cir. 2020). "The threshold standard for proving a hostile work environment claim is generally the same for both Title VII and § 1983." *Id.* A municipality may only be held liable under § 1983, however, if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Such liability is known as *Monell* liability. *See, e.g.*, *Legg*, 979 F.3d at 118. Importantly, "a municipality cannot be held liable *solely* because it employs a tortfeasor . . . in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

A plaintiff can establish an official policy or custom by showing one of the following:

> (1) [A] formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *See Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed. App'x. 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

*McLennon v. City of New York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016). A plaintiff seeking to establish an official policy or custom through the actions of a single individual need not show that

the official in question is a policymaker for all purposes; rather, "the court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (cleaned up). "Whether the official in question possessed final policymaking authority is a legal question . . . 'to be resolved by the trial judge *before* the case is submitted to the jury.'" *Id.* at 57 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). A "plaintiff bears the burden of establishing as a matter of law that the conduct of a given official represents official policy." *Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 427 (2d Cir. 2004) (quoting *Jeffes*, 208 F.3d at 57–58).

The policymaker inquiry is also relevant where a plaintiff seeks to establish an official policy or custom by demonstrating a persistent and widespread practice: She must show that any "unconstitutional conduct [was] so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (quotation marks omitted). "*Actual* notice by the policymakers need not be proven," however, "if a practice is 'so persistent and widespread as to practically have the force of law.'" *Id.* at 306 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Plaintiff offers two theories of how the Town might be liable under Section 1983 for her hostile work environment claim. First, in her cross-motion for summary judgment on the issue of Mr. Marino's policymaker status, she contends that his own actions constituted official policy. Pl.'s Opp'n 34–37. She characterizes him as "a policymaker with respect to personnel policies and decisions within DGS," emphasizing that he could have used his authority to discipline or transfer employees who were contributing to the department's sexualized atmosphere. *Id.* at 36–37. In support of this position, plaintiff cites the following: the Town's anti-harassment policy, which

charges supervisors with receiving complaints of harassment; a portion of the Town Code, which states that the DGS Commissioner "shall exercise overall administration and supervision of the Department" and "shall have the power to appoint and remove all other subordinate officers and other employees," Sethi Decl., Ex. 8 at 1, ECF No. 54-8; various records indicating that commissioners are involved in hiring decisions, *e.g.*, *id.*, Ex. 9 at 5–6, ECF No. 54-9; Ex. 22; a portion of Mr. Sammon's deposition in which he explained that department heads such as Commissioner Marino implement disciplinary actions against employees without the approval of the Board or Human Resources, *see* Pl.'s Opp'n 36–37; and evidence indicating that Mr. Marino moved certain employees to different positions within DGS, *see* Marino Tr. 111:8-25, ECF No. 54-1; Ex. 20. Defendants in turn contend that they are entitled to summary judgment on this question because plaintiff has not met her burden of showing that Mr. Marino's actions constituted official policy. *See* Defs.' Mot. 33; *Hurdle*, 113 Fed. App'x at 427.

Plaintiff's argument hinges on the notion that Mr. Marino could have exercised his disciplinary power to quell sexual harassment within DGS. Even assuming the relevance of any such authority to Mr. Marino's *own* allegedly harassing actions, however, plaintiff has failed to identify evidence indicating that Mr. Marino indeed has authority to discipline employees for sexual harassment. Although the Town's anti-harassment policy directs employees to bring concerns about sexual harassment to their department heads, it goes on to task such supervisors with reporting those concerns to Human Resources and the Town Attorney for investigation and indicates that any discipline will follow the results of an investigation. *See* Ex. S at 424–25; *see also* Sammon Tr. 154:4–155:14, ECF No. 54-3 (noting that the Town Attorney can investigate complaints without Human Resources' involvement, and that departments implement disciplinary action on the recommendation of the Town Attorney). Nowhere does the policy suggest that

31

commissioners are tasked with disciplining employees found to have violated its terms. And although Mr. Sammon did testify that department heads such as Mr. Marino could discipline employees without the approval of the Town Board or Human Resources, he did so in the context of explaining that any such discipline would be on the recommendation of the Town Attorney as part of its aforementioned process for investigating and disciplining sexual harassment. Sammon Tr. 154:4–155:14, ECF No. 54-3. This testimony therefore does not suggest that Mr. Marino could have unilaterally exercised disciplinary power to address sexual harassment, nor has plaintiff pointed to any other evidence suggesting that Mr. Marino could deviate from the recommendation of the Town Attorney. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

In sum, although plaintiff has cited evidence indicating that Mr. Marino had general supervisory authority over DGS, including the ability to hire and transfer employees, she has failed to cite any evidence indicating that he was a policymaker with regard to disciplining employees for sexual harassment. "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit"— here, sexual harassment. *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). Mr. Marino's ability to hire and transfer employees, without more, says nothing about whether he was a policymaker with regard to enforcing the Town's anti-harassment policy—particularly when contrasted with that policy's express delegation of investigation and discipline to Human Resources and the Town Attorney. *See Poulsen v. City of N. Tonawanda, N.Y.*, 811 F. Supp. 884,

888, 897 (W.D.N.Y. 1993) (concluding that a supervisor was a policymaker for the purposes of disciplining employees for sexual harassment where he had the authority to conduct his own investigation into the plaintiff's complaint, could discipline anyone he deemed to be acting inappropriately without consulting another entity, and directed everyone who worked the plaintiff's shift to be "talked to about" what constituted sexual harassment and to be admonished to stop all offensive behavior). It is certainly possible that additional evidence could show, for example, that Mr. Marino frequently disciplined employees for sexual harassment without the involvement of the Town Attorney, or otherwise acted without the Town Attorney's recommendation. Plaintiff has not offered any such evidence, however, and therefore has not met her burden of demonstrating as a matter of law that Mr. Marino was a policymaker whose actions subjected the Town to municipal liability. Plaintiff's cross-motion for summary judgment on the issue of Mr. Marino's policymaker status is therefore denied, and defendants' motion for summary judgment on this theory of municipal liability is granted. *See Jeffes*, 208 F.3d at 57 (deeming this question a legal question to be resolved by the trial judge, not the jury).

Plaintiff's second theory of *Monell* liability, raised in her opposition to defendants' motion for summary judgment, is that sexual harassment at DGS was sufficiently widespread so as to constitute a custom, and that senior policymaking officials acquiesced to this conduct. Pl.'s Opp'n 30–34. As an initial matter, plaintiff's argument focuses on Mr. Marino's alleged acquiescence, and as discussed, plaintiff has not offered evidence indicating that Mr. Marino was a policymaker with respect to the conduct challenged in her lawsuit. *See id.* Plaintiff makes only a passing illusion to the notion that *other* policymakers may have had constructive notice of harassment within DGS, and she does not theorize who these policymakers might have been. Even if plaintiff could show that Mr. Marino's "failure to address the harassment supports an inference that [the policymaker

to whom he reported] also knew of the harassment and allowed for the conduct to become the accepted custom or practice of the [Town]," she has not identified a genuine issue of material fact as to whether sexual harassment within DGS was sufficiently persistent and widespread to serve as a basis for *Monell* liability. *Matusick*, 757 F.3d at 63.

Although the Second Circuit has not adopted a bright-line rule for how many incidents renders a practice sufficiently persistent or widespread, it has deemed evidence showing no more than three or four incidences to "f[a]ll far short of showing a policy [or] custom." *Jones*, 691 F.3d at 85; *see also Giaccio v. City of New York*, 308 Fed. App'x 470, 472 (2d Cir. 2009) (holding that a plaintiff could not establish municipal liability where he identified, "at most, only four examples" of the conduct at issue); *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (deeming thirteen incidences insufficient to state a custom); *Ki v. City of New York*, No. 20-CV-4343 (ARR) (JRC), 2022 WL 5423642, at *6 (E.D.N.Y. Sept. 1, 2022), *report and recommendation adopted sub nom. Ki v. Kim*, No. 20-CV-4343, 2022 WL 4551378 (E.D.N.Y. Sept. 29, 2022) (holding that three examples of conduct were insufficient to demonstrate a widespread practice). Plaintiff has provided admissible evidence of only a handful of incidences at DGS, and although these accounts are troubling if true, they do not evince conduct sufficiently widespread or pervasive to render the Town liable under § 1983.

Plaintiff offers three sworn statements describing specific instances of sexual harassment in the department. First, Mr. Flanagan describes overhearing an inappropriate FaceTime conversation in the DGS office between several employees who were present and another who was on maternity leave; he says that they asked her to expose herself to them, that she described touching herself, and that one employee said that he might sleep with her "after a couple of drinks." Flanagan Decl. ¶ 15. Second, Mr. Seifert testified to hearing a DGS employee ask his secretary

about the color of her underwear. Seifert Tr. 112:8-21, ECF No. 54-4. Finally, Ms. Mulligan herself testified that Mr. Marino commented on her appearance, touched her legs and buttocks, reached down her shirt, and asked her to kiss him on the cheek. Mulligan Tr. 155:23-25, 156:12-21, 159:2-3, 179:13-23.[9]

Although plaintiff references other instances of inappropriate conduct, *see* Pl.'s Opp'n 3–5, 31–32, many of these rely on inadmissible evidence, while others are vague or overly generalized. Both Mr. Flanagan's declaration and an email authored by Mr. Pitnick describe events that "are founded on hearsay and 'rumors' and are unsupported by testimony of someone who directly witnessed the alleged events." *Hoit v. Cap. Dist. Transportation Auth.*, No. 15-CV-134 (CFH), 2018 WL 2324050, at *6 (N.D.N.Y. May 22, 2018), *aff'd,* 805 F. App'x 41 (2d Cir. 2020); *see* Flanagan Decl. ¶ 12 (describing several incidents that he heard about but did not witness);

███████████████████████████████████████████████████████████████

██████. Mr. Flanagan describes hearing frequent conversations about people's sex lives;

████████████████████████████████████████████████████████████████.

Flanagan Decl. ¶¶ 11–12; ████████████████████████████████████

████████████████████████. Such "vague testimony" regarding "locker room" talk is insufficient to evince a widespread practice of sexual harassment. *Mellett v. City of Philadelphia*, No. 20-CV-1629 (JMY), 2022 WL 2391141, at *7 (E.D. Pa. July 1, 2022).

Plaintiffs are not categorically barred from "demonstrat[ing] a widespread practice or custom with evidence limited to personal experience, [but] it is necessarily more difficult, because what is needed is evidence that there is a true municipal policy at issue, not a random event."

---

[9] Plaintiff references a fourth concrete instance in which coworkers commented in a group chat that a colleague "spends all his money on hand jobs and books," but the exhibit to which she cites, Exhibit 29, does not contain evidence of this interaction. Pl.'s Opp'n 3; *see generally* Ex. 29.

*Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (cleaned up); *see also Lopes v. Westchester Cnty.*, No. 18-CV-8205 (KMK), 2020 WL 7029002, at *11 (S.D.N.Y. Nov. 30, 2020) (holding that a plaintiff "cannot state a consistent and widespread practice simply by alleging his own experiences and then extrapolating" (quotation marks omitted)). Here, plaintiff has primarily offered testimony about Mr. Marino's conduct toward her, along with two admissible and concrete descriptions of conduct involving other employees. This is insufficient to create a material fact question as to whether conduct was so widespread and pervasive as to permit an inference of municipal policy. Defendants' motion for summary judgment on plaintiff's second theory of *Monell* liability is therefore also granted.

## CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED as to plaintiff's *quid pro quo* harassment claims and *Monell* claim, and DENIED as to her retaliation claim and the applicability of the *Faragher/Ellerth* defense. Plaintiff's cross-motion regarding Mr. Marino's policymaker status is DENIED.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:          January 8, 2024
                Brooklyn, New York

36